## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CHT HOLDINGS, LLC,

      Plaintiff,

    v.

TELEFONICA INTERNATIONAL
WHOLESALE SERVICES AMERICA, S.A.

    and

TELXIUS CABLE REPUBLICA
DOMINICANA, S.A.S.,

      Defendants.

Civil Case No. _____

## COMPLAINT

Plaintiff CHT Holdings, LLC ("CHT"), by and through undersigned counsel, as and for its complaint against Telefonica International Wholesale Services America, S.A. and Telxius Cable Republica Dominicana, S.A.S. (together, "Telxius"), states as follows:

### NATURE OF ACTION

1.     This is a complaint for damages arising from the parties' efforts to develop submarine cable and other international telecommunications facilities between and among locations in the continental United States, Puerto Rico, the Dominican Republic and Haiti.  CHT is the purchaser and Telxius is the seller of certain telecommunications assets that have not been delivered as agreed.  By this action, CHT seeks damages for the loss of use and loss of value in the assets it agreed to purchase, and for losses it suffered as a result of misrepresentations made to it by Telxius.

<u>PARTIES</u>

2.      Plaintiff CHT Holdings LLC ("CHT") is a limited liability company organized under the laws of Delaware with its principal place of business in 1820 N Corporate Lakes Blvd, Ste. 101, Weston, Florida, 33326.  CHT has two members.  One member is an individual who is a resident of Florida.  The other member is a Delaware corporation with its principal place of business in North Carolina.  CHT is in the business of delivering international telecommunication voice services to customers around the globe.  As relevant here, CHT provides services to customers in the Puerto Rico and Dominican Republic markets, directly and through its affiliates.

3.      Defendant Telefonica International Wholesale Services America ("TIWS")  is a corporation organized under the laws of Uruguay with its principal place of business in Av. Luis A. de Herrera 1248, piso 4, Montevideo, Uruguay.  TIWS is the infrastructure affiliate of Telefónica, S.A. one of the largest telecommunications providers in the world by number of customers.  Trading under the name "Telxius Cable America S.A.," TIWS maintains more than thirty thousand sites across Europe and the Americas, and operates a network of 87,000 km of high-capacity fiber optic submarine cable.  Among other assets, TIWS operates the "Brusa" and "SAm-1" submarine fiber optic cable networks.

4.      Defendant Telxius Cable República Dominicana, S.A.S. ("Telxius-Dominicana") is a corporation organized under the laws of the Dominican Republic with its principal place of business at Av. Ronda de la Comunicación, s/n, Districto C, Edificio Norte 2, 1* Planta 28050 Madrid, España.  Trading under the name "Telxius," Telxius-Dominicana is the Dominican affiliate of TIWS, through which it contracts for services in the Dominican Republic. Defendants TIWS and Telxius-Dominicana are collectively referred to herein as "Telxius."

## JURISDICTION AND VENUE

5.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Telxius transacts business in this district through its affiliate Telxius Cable USA, Inc., a Florida corporation, and because CHT and Telxius have agreed to submit to the exclusive jurisdiction of the Florida state courts and the United States District Court for the Southern District of Florida for the resolution of any disputes arising under their agreement.

## BACKGROUND

***A.      Latin America Telecommunications Infrastructure***

7.      One of Telxius's central lines of business is building and selling capacity on a number of submarine telecommunications cable networks that it operates with strategic landing points across the Atlantic and Pacific coasts of Latin America and select locations in the United States and Europe.  Telxius's customers are local telecommunications and data providers with facilities in locations accessible to a Telxius network connection point.  By interconnecting with these local networks, Telxius is able to provide capacity for that carrier's traffic to flow over a Telxius backbone for delivery to its destination.

8.      Two of these Telxius networks are called "SAm-1" and "Brusa," respectively, with interconnection points in the United States and specified locations in Latin America, as indicated in the illustration below, drawn from Telxius's web site.



9.      SAm-1 is a pre-existing network serving points throughout South and Central America with US connection points in San Juan, Puerto Rico and Boca Raton, Florida (the name "SAm-1" is an abbreviation of "South America-1").  The primary SAm-1 network has been in service for well over a decade, and for all times relevant to this dispute.  Brusa is a newer, high-speed cable network designed to provide a direct connection between Brazil and the United States (the name "BRUSA" is a compound abbreviation of "BRazil" and "USA")—specifically, to a domestic landing in Virginia.  Brusa went into service in 2018.  Other networks operated by Telxius are not at issue here.

10.      Both SAm-1 and Brusa are subsea fiber optic cable systems designed to carry telecommunications and data traffic between interconnection points.  SAm-1 comprises two fiber pairs of optical cable, and Brusa comprises eight fiber pairs of optical cable, and the Brusa cable is a newer generation, lower latency cable than employed in SAm-1.  Telxius advertises the capacity of SAm-1 at 20 Tbps (terabits per second), and Brusa at 160 Tbps.

B.      *History of the SAm-1 and Brusa network expansion*

11.     For a number of years prior to the events of this dispute, the SAm-1 network existed but did not include any fiber extensions to the Dominican Republic.  The Brusa network did not yet exist.

12.     Not later than early 2016, Telxius entered into discussions with non-party Broadband Access Ventures Group ("BAVG"), a limited liability company based in Puerto Rico for the purpose of funding a planned expansion of SAm-1 to Punta Cana, Dominican Republic. The goal of that venture was to provide a direct connection from the Dominican Republic to Puerto Rico, where that new extension could interconnect with the newer Brusa cable that Telxius was planning to build for high-speed and high-capacity transmission to the United States. The primary value of this venture was that the ability to directly connect the Dominican Republic to the continental United States through Brusa was unique among existing telecommunications network facilities.  With a dearth of providers in the market, the counterparty—at the time, BAVG—would have a competitive advantage on high-speed high-capacity telecommunications and data service to and from the Dominican Republic until such time as competing carriers could build and market their own parallel networks.  Upon information and belief, certain representatives of Telxius had undisclosed financial interests in BAVG.

13.     Telxius and BAVG executed an agreement dated March 30, 2016 to implement the SAm-1 extension to the Dominican Republic.  Under that agreement, BAVG agreed to pay one million dollars within thirty days followed by another six million three months later, and additional scheduled payments ultimately totaling sixty million dollars.  Telxius estimated delivery of the Brusa and Sam-1 cable at 3Q 2018.

14.     BAVG paid the first million dollars under its agreement with Telxius, but did not make the second installment of six million dollars.  Telxius thereafter declared BAVG in default and in 2017 Telxius approached CHT in 2017 to discuss essentially the same project.  Telxius wanted CHT to purchase (and fund) the proposed expansion of SAm-1 from San Juan to Punta Cana (the "Dominican extension"), and a portion of the Brusa spectrum being extended from Virginia Beach to San Juan (the "PR extension").  CHT was unaware that Telxius had previously contracted with BAVG and previously declared BAVG in default under their agreement.

15.     BAVG subsequently reorganized into what is today known as Blackburn Networks (trading under the name "Blackburn Technologies"), a wholesale telecommunications carrier based in Guaynabo, Puerto Rico (hereinafter, "Blackburn").

C.      *The Telxius-CHT Venture*

16.     In August 2017, Telxius and CHT signed a Memorandum of Understanding reflecting their agreement to collaborate on the development of the PR extension and the Dominican extension.  In general terms, CHT agreed to purchase and fund construction of the SAm-1 extension, and purchase a portion of the Brusa spectrum accessible in San Juan.

17.     During the period that Telxius was negotiating with CHT, Telxius was simultaneously negotiating with Blackburn to sell the same assets.

18.     By Service Agreement dated December 14, 2017 ("Master Agreement"), Telxius and CHT formalized their agreement.  A copy of the Master Agreement is attached hereto as Exhibit A.

19.     In relevant part, the Master Agreement provides that Telxius would sell, and CHT would purchase the following for a term of not less than eighteen (18) years beginning upon the later delivery of:

a. <u>SAm-1</u>:  the entire two-pair fiber optic cable between Punta Cana (DR) and San

Juan (PR); and

b. <u>Brusa</u>:  spectrum equivalent to a half pair of fiber and, if necessary, any additional

spectrum to reach a minimum of 9.5 Tbps.

20.     CHT's contemplated ownership interest in the respective assets is an indefeasible

right of use ("IRU"), which is a form of long-term exclusive right of use (similar to a lease) but

in which the entirety of the encumbered asset is beneficially owned—during the IRU term—by

the purchaser.

21.     While both assets were purchased as IRUs, the nature of the assets differed

between the two networks.

22.     With respect to SAm-1, CHT purchased the entirety of the two fiber pairs.  The

Dominican extension was designed exclusively for the purpose of supporting direct high-

capacity telecommunications services between the Dominican Republic and continental United

States, through Puerto Rico.

23.     With respect to Brusa, CHT did not purchase any single identifiable fiber or fiber

pair; rather, CHT purchased roughly 6.25% ($^{1}/_{16}$th) of the spectrum achieved from the eight fiber

pairs that make up the network.  In the language of the Master Agreement, Telxius sold CHT

"the spectrum equivalent to half fiber pair of BRUSA and, if necessary, any additional spectrum

to reach a minimum of 9.5 Tbps in BRUSA . . . ."

24.     By selling "spectrum" rather than any particular level of "capacity," the parties

were agreeing that CHT was acquiring an asset, rather than merely using an asset that remained

owned by Telxius.  As the parties clarified on the eve of the Master Agreement, "[I]f Telxius

sells capacity in DR and Haiti it will buy it from CHT until capacity is exhausted during the life of the agreement."  Telxius was explicit that "CHT is the owner of the assets."

25.     For all intents and purposes, CHT was purchasing its interests (either the full interest in the Dominican extension or the spectrum portion of the PR extension) for the life of the respective networks.  The stated term of both IRUs was eighteen years beginning upon the later activation of Brusa and SAm-1, but "the IRU Service Term will be extended for the Useful Economic Life of the cable's Useful Economic Life if it exceed[s] 18 years."  At the time of the parties' MOU, Telxius estimated that both networks would be up and running within twelve months—i.e., by August 2018.  By the time of the Master Agreement, the parties agreed to soften the precision of that deliverable to "3Q 2018," (i.e., sometime in July, August, or September 2018).

26.     Because construction of the SAm-1 network was not going to be operational until the third quarter of 2018, CHT demanded and Telxius agreed to provide interim capacity of 30 Gbps (0.03 Tbps) until the activation date of SAm-1.

27.     In exchange for timely delivery by Telxius of both fully-functional assets and the interim capacity specified above, CHT agreed to pay six million dollars ($6,000,000) within the first thirty days following execution of the Master Agreement, and another twenty-five million dollars ($25,000,000) on specified dates after activation of the later of the two networks and delivery of service to the purchaser.  CHT also agreed to pay certain operations and maintenance ("O&M") expenses on an ongoing basis after the two networks were both in service.

28.     The market value of the assets being sold by Telxius declined between 2015 and the end of 2017, when it signed the Master Agreement with CHT.  While CHT agreed to pay a total of $31 million for the purchase, BAVG had been willing to pay $60 million the year prior.

That price differential is the reason that Telxius continued to negotiate with BAVG even after contracting with CHT.  CHT was not aware of those continued negotiations at the time.

29.     Under the Master Agreement, Telxius was solely responsible for providing the building—called a cable landing station or "CLS"—as well as HVAC, power, physical security, and any necessary rights-of-way, occupancy permits, and other regulatory approvals.  Telxius also was responsible for all testing of Brusa and SAm-1 to assure full functionality prior to delivery.

30.     CHT paid all amounts due, but Telxius has not delivered any of the promised IRUs—in Brusa or SAm-1, including any of the interim capacity.

**D.      *Post-Contracting Activity***

31.     The parties executed the Master Agreement in December 2017, but Telxius failed to deliver the annexes, appendices, exhibits, and schedules that the parties would need for future performance.

32.     The parties contracted on the basis of Telxius's projection that it would complete construction—using the money CHT advanced—within six to nine months, by the third quarter of 2018.

33.     On that basis, CHT began financing activities premised on obtaining the purchased collateral on the scheduled timetable.  Similarly, CHT began marketing telecommunications capacity to the Dominican Republic and Puerto Rico to other telecommunications carriers and large telecommunications customers.

34.     Yet as 2018 progressed, Telxius began to delay, and was never able to provide CHT, its financing partners, or any CHT prospective customers, with reasonable assurances that the purchased assets would be delivered as promised.

35.     In September 2018, CHT requested that Telxius provide a customer order form ("COF") so that CHT could accommodate Telxius's procedure for demanding activation of network capacity.  Because CHT knew that it would not be able to timely deliver the network, it delayed providing CHT a COF in September 2018, or at any time through the remainder of the year or throughout 2019.  Telxius later provided a COF reflecting 200 Gb of capacity in January 2020, with a date that did not correspond to CHT's original request.

36.     In reliance on Telxius's assurances that it would be able to deliver the first 200 Gb of ordered capacity, CHT acquired an IP circuit with non-party Cogent Communications ("Cogent"), a Virginia-based optical fiber provider, to connect to Telxius's network for the purpose of transmitting the anticipated data.  Because Telxius has still never activated the network (including the first $200 Gb of data capacity), CHT has incurred losses in excess of $400,000 from the cost of obtaining from Cogent services that Telxius knew it would not be able to activate and deliver to the Dominican Republic.

37.     Upon learning of the Telxius/CHT agreement, Blackburn reached an agreement with Telxius by which Blackburn purchased an interest in the Brusa PR extension, which may have purported to include certain exclusive rights in derogation of CHT's rights.

38.     While CHT was awaiting Telxius's work in 2018, the parties began taking steps to register for the appropriate licenses with the Federal Communications Commission ("FCC"). In response to CHT's efforts to register the Dominican extension with the FCC, Telxius asserted that the process would take too long to register in CHT's name (because CHT was a new registrant) and that it would be easier to register under Telxius's existing licenses with CHT identified as a "partner" assigned to manage capacity in the Dominican Republic.  Telxius asserted that registering under CHT's name would prevent it from delivering the cable on time

due to the lengthy FCC process.  In reliance on Telxius's assertion that the licensing would not alter CHT's ownership of the purchased assets, CHT halted its own registration efforts with the FCC.

39.     Notwithstanding Telxius's ability to register in its own name, the third quarter of 2018 came and went without Telxius providing the two networks.

40.     Cognizant that it would miss the 3Q18 projected delivery and that it still had not provided even the 30 Gbps of interim capacity, Telxius proposed an amendment to the Master Agreement that would modify the timetables and financial obligations of the parties.

41.     Telxius calculated at that time (about three months after the 180-day deadline by which Telxius was required to provide interim service), that the 30 Gbps of interim capacity not delivered during the prior three months was valued at approximately $2 million for the three-month period, or approximately $22,000 per Gb per month.

42.     During this period, CHT approached the law firm of Hunton Andrews Kurth LLP ("Hunton") to obtain legal advice concerning its rights with respect to negotiating a modification to the Master Agreement in light of Telxius's nonperformance.  Throughout the summer and fall of 2018, counsel at Hunton repeatedly counseled against taking action adverse to Telxius, and lobbied repeatedly for CHT to simply agree to Telxius's proposed terms.

43.     CHT was unsatisfied with the Hunton representation, and in November 2018 approached an attorney at DLA Piper about helping CHT negotiate a modification.  That attorney advised that because the firm had a relationship with Telxius, it would require a waiver from Telxius before proceeding.  DLA Piper and CHT requested that waiver, but Telxius refused.

44.     The parties' negotiations ended without any modification or amendment being finalized.

45.     By the end of the fourth quarter of 2018, Telxius still had not completed construction, or landed its cable, or tested its network, or activated any of the contracted assets.

46.     Telxius also failed to perform by the end of the first quarter of 2019, or the second quarter of 2019.

47.     By June 2019, the duration of Telxius's non-performance had exceeded by 100% the entire estimated time line for construction and delivery of the two networks.  At that point, in mitigation of its already incurred and ongoing damages and in furtherance of efforts to enable some measure of performance under the Master Agreement, CHT incurred additional expenses of obtaining and providing to Telxius a building within which Telxius would construct the cable landing station in the Dominican Republic, which Telxius had not been able to deliver.  The parties caused an 18-year lease to be executed under which Telxius would rent the building from a CHT affiliate for a fixed amount each month, beginning after Telxius's final acceptance of the CLS built by CHT.

48.     Telxius recommended to CHT that it hire a company called Thallus Innovations ("Thallus") as the construction contractor for the CLS.  Telxius represented that Thallus was reputable, competent for the proposed bespoke structure, and independent of Telxius.  These statements were knowingly false.  In fact, Thallus conspired with Telxius to undermine CHT's performance under its affiliate's agreement to build the CLS.  Thallus delayed performance while providing regular reports to Telxius in hopes of being engaged by Telxius as the main contractor to maintain the terrestrial fiber optic connection built for Telxius from the beach where the submarine cable arrived to CHT land. Essentially, Thallus has been controlling the

arrival of the cable and was employed by Telxius at the same time that it built the CLS for CHT, creating an obvious conflict of interest.

49.     The CLS contract between CHT's affiliate and Telxius was a pre-existing Telxius form that included a "step in" right—i.e., under certain circumstances, Telxius could "step in" to CHT's shoes and direct the completion of construction.  The CLS contract provided that Thallus would be the only party allowed to perform any work commissioned under this "step in" right, providing an incentive for Thallus to underperform for CHT because it knew Telxius would engage it to address any uncompleted items.

50.     As the project continued through the fall of 2019, the parties were unable to reach agreement on an appropriate testing and delivery protocol reflecting objective measures for Telxius to demonstrate adequate functionality of the cable it was planning to deliver to CHT.

51.     The value of the purchased assets has diminished materially since 3Q 2018, and is no longer worth the price CHT would have paid had Telxius timely performed.  While the assets were devaluing, Telxius failed to make services available to CHT to monetize its interests in Puerto Rico, which CHT was entitled to pursue under the Master Agreement.

52.     In the fall of 2019, CHT began to suspect that part of the reason Telxius was so delayed in its performance is that it was negotiating with third parties to monetize the same assets it had already sold to CHT.  Telxius acknowledged that it had failed to perform as planned, and it knew that CHT would insist on price reductions for the assets by the time they ultimately might be delivered.  If Telxius were able to discourage CHT from proceeding under the Master Agreement, then it might have an opportunity to extract from Blackburn some of the increased value that Blackburn had placed on the assets relative to CHT ($60 million vs. $31 million).

53.     In this same period, Telxius stated an intent to complete the cable connection and activate service on the SAm-1 network without demonstrating adequacy of the fiber and without acknowledging the material economic impacts of Telxius's many failures.  Upon information and belief, Telxius was pursuing an agreement with Blackburn by which Telxius would attempt to declare a default by CHT's affiliate in the construction of the CLS, thereby creating the potential of Telxius selling some portion of the project to Blackburn.

54.     In November 2019, CHT advised its counsel at Hunton that it was considering legal action against Telxius arising from the latter's misrepresentations and failures to perform, upon which Hunton advised that it would not agree to represent CHT in such a dispute.  Not until a meeting in Madrid on February 28, 2020 did CHT learn that Hunton was Telxius's outside counsel, and that representatives of Telefónica had been conferring with the very same Hunton attorney regarding the CHT dispute since 2018.

55.     During the same February 2020 meeting, Telxius suggested to CHT that Blackburn be a perfect candidate to join the project as a co-investor with CHT, ostensibly to share the costs of the bespoke assets.  Because Blackburn and CHT are competing telecommunications providers, the prospect of a co-investment is irreconcilable with the primary purpose (and basis for value) in the venture.  Because CHT purchased the entirety of the two fiber pairs of SAm-1 between San Juan and Punta Cana, no other telecommunications carrier is able to utilize that particular route without contracting directly with, or through, CHT.  The true motivation for introducing Blackburn to the discussions was to bypass the central provisions of the Master Agreement—exclusivity to CHT of the route to the Dominican Republic and Haiti— and undermine the entire premise of the commercial venture for CHT.

56.     Throughout the spring and summer of 2020, Telxius continued to state an intent to complete the cable connection and activate service on the SAm-1 network without demonstrating adequacy of the fiber (and again, without acknowledging the material economic impacts of Telxius's failures).

57.     During this period, Telxius agreed to not enforce any "step in" right so long as the parties were meeting regularly to work toward completion.  Notwithstanding that agreement, Telxius began sending formal reservations of rights to "step in" as a result of Thallus's nonperformance.

58.     CHT had little choice but to engage a third-party technical consultant to evaluate the technical aspects of Telxius's work and hold Telxius accountable for adequate testing and functionality of the SAm-1 extension.  To date, the parties have not agreed on an objective protocol for testing and delivery.

59.     As a result of Telxius's delay, CHT was unable to take possession of the purchased assets in 3Q 2018 as agreed, and CHT was unable to use the value of the undelivered assets to support CHT's financing activities in 2018 and 2019.  Moreover, CHT was unable to generate revenues from the sale of telecommunications capacity using the purchased assets.  So CHT's debt load increased while its revenues flatlined.

60.     Notwithstanding its own failures, Telxius has threatened to unilaterally activate the SAm-1 network and pursue claims against CHT for the entirety of the $25 million originally contemplated for a fully tested and functioning network due (but not delivered) two years ago.

**COUNT ONE**
**(Breach of Contract - Damages)**

61.     CHT incorporates the allegations of paragraph 1 through 60 as if fully set forth herein.

62.     Telxius sold, and CHT purchased, the two fiber pairs of SAm-1 and spectrum equivalent to a half fiber pair of Brusa, for delivery and activation in 3Q 2018.

63.     As part of the parties' agreement, Telxius agreed to deliver interim capacity of 30 Gbps in Telxius's fiber networks, through and including the date of activation of SAm-1.

64.     CHT has paid all sums and done all actions required under the parties' agreement prior to 3Q 2018.

65.     Telxius has not delivered and activated both Brusa and SAm-1 networks, and has not delivered interim capacity of 30 Gbps to CHT.

66.     Telxius's failures constitute material breaches of the Master Agreement for which CHT is entitled to damages.

## COUNT TWO
### (Breach of Contract – Setoff and Recoupment)

67.     CHT incorporates the allegations of paragraph 1 through 60 as if fully set forth herein.

68.     Telxius sold, and CHT purchased, the two fiber pairs of SAm-1 and spectrum equivalent to a half fiber pair of Brusa, for delivery and activation in 3Q 2018.

69.     As part of the parties' agreement, Telxius agreed to deliver interim capacity of 30 Gbps in Telxius's fiber networks, through and including the date of activation of SAm-1.

70.     CHT has paid all sums and done all actions required under the parties' agreement prior to 3Q 2018.

71.     Telxius has not delivered and activated both Brusa and SAm-1 networks, and has not delivered interim capacity of 30 Gbps to CHT.

72.     Telxius's failures constitute material breaches of the Master Agreement sufficient to excuse CHT from further performance should it so elect, including with respect to payment of

additional sums calculated at the time of contracting on the basis of performance by Telxius that has not occurred.

73.     As a result of injuries caused by Telxius's breaches, CHT is entitled in its future performance under the Master Agreement to setoff all damages incurred, including the diminution in value of the assets purchased, as against any further amounts otherwise due and payable from CHT to Telxius.

## COUNT THREE
### (Implied Covenant of Good Faith and Fair Dealing)

74.     CHT incorporates the allegations of paragraph 1 through 60 as if fully set forth herein.

75.     The Master Agreement incorporates an implied covenant of good faith and fair dealing in addition to its express terms.  The implied covenant governs Telxius's exercise of discretion in carrying out its duties under the Master Agreement, and generally obligates it to act in accordance with both parties' reasonable contractual expectations, so that Telxius does not deny CHT the intended benefits of the contract.

76.     Here, Telxius violated the implied covenant by the following conscious and deliberate acts, among other acts and omissions, for which the Master Agreement is silent but which tend to frustrate the Master Agreement and deprive CHT of the intended benefits and reasonable expectations of the parties' agreement:

    a.   Telxius withholding or delaying delivery of annexes, appendices, exhibits, and schedules necessary for the parties to govern their future performance under the Master Agreement;

    b.   Telxius attempting to pass off a hotel store room as a "CLS" site supposedly in discharge of its obligation to provide a landing station for CHT's benefit;

c.  Telxius refusing to deliver a COF for 200 Gb of activated service in or about September 2018, while representing to CHT that Telxius would be able to timely perform;

d.  Telxius insisting on registering the Dominican extension in its own name while representing to CHT that CHT would own the cable;

e.  Telxius encouraging CHT to engage contractors and service providers (including counsel) with whom Telxius maintained relationships, to gain insight into CHT's dealings and undermine CHT's ability to extract value from those relationships, and by extension, from the Master Agreement;

f.  Telxius falsely indicating an intent to waive the provisions of "step in" language in its pre-existing form contract for CLS lease;

g.  Telxius refusing to document protocols for adequate objective testing and performance monitoring prior to "delivering" cable service to CHT;

h.  Telxius continuing to negotiate with Blackburn and its predecessors in interest to extract economic value from the purchased assets in contravention of CHT's exclusive rights; and

i.  Telxius maintaining an extended dialogue with CHT's counsel during the construction phase of the CLS and amendment of the Master Agreement, in an effort to deny CHT the economic benefits of the venture.

77.  As a result of Telxius's conduct, CHT has been harmed in the amount of the diminished value of the purchased assets, the direct expenses incurred by CHT in mitigation of Telxius's failures, including by having to engage a third-party technical contractor for testing and

delivery protocols, and injury to CHT's reputation and relationships with counterparties in connection with the PR extension and the Dominican extension.

## COUNT FOUR
### (Tortious Interference)

78.     CHT incorporates the allegations of paragraph 1 through 60 as if fully set forth herein.

79.     Throughout the course of its dealings with Telxius, CHT has maintained business relationships with its attorneys at Hunton and with certain other consultants and contractors known to Telxius, including Thallus, and also the local Dominican electricity supplier, CEPM. Telxius also interfered with CHT's licensing relationship with the FCC.

80.     Telxius intentionally and unjustifiably interfered with CHT's business relationships in the following ways:

   a.  Hunton:  Telxius maintained an ongoing dialogue with CHT's lawyer during the course of its engagement, exploiting confidential knowledge about CHT's rights, concerns, and legal theories, and influencing the substantive legal advice that CHT was receiving, thus depriving CHT the benefit of independent confidential legal advice and utilizing CHT's confidential information in furtherance of Telxius's own interests.

   b.  Thallus:  Telxius pursued an ongoing undisclosed relationship with Thallus to delay construction of the CLS while simultaneously gaining confidential information about CHT.  Telxius promised to compensate Thallus for any delayed work, and to engage Thallus in its own name upon Telxius "stepping in" under the CLS lease agreement with CHT's affiliate.

c. CEPM:  Telxius repeatedly contacted CEPM, representing that Telxius rather than CHT was the real party in interest for provision of electricity to the CLS, and interfering with CHT's ability to obtain timely and adequate electricity service for the CLS.

d. FCC:  While representing to CHT that Telxius recognized CHT's purchase of the assets, Telxius falsely represented to the FCC that the PR extension and Dominican extension were Telxius's property without disclosing any ownership, beneficial interest, or encumbrance in favor of CHT.  As a result, CHT was denied the licensing rights necessary to utilize the benefits of the assets it purchased from Telxius, by activating telecommunications and data services and otherwise freely negotiating the purchased assets.

81.     As a result of Telxius's interference, CHT has been damaged in the ways stated above.

**COUNT FIVE**
**(Unjust Enrichment)**

82.     CHT incorporates the allegations of paragraph 1 through 60 as if fully set forth herein.

83.     In the alternative to CHT's contract claims, insofar as the Master Agreement is determined to be invalid or fails to address fully the relationship between the parties, then CHT is entitled to recover from Telxius the value of the benefit conferred on it by CHT.

84.     CHT has advanced six million dollars ($6,000,000) in contemplation of acquiring assets that Telxius failed to timely deliver (and as of this date, has not delivered at all).

85.     The SAm-1 (Dominican) extension was designed specifically for the purpose of creating the exclusive rights to provide high-speed high-capacity service to the Dominican

Republic through Puerto Rico (using the Brusa connection to the continental United States) that CHT purchased.

86.     Telxius has used CHT's money to construct the SAm-1 extension (and may have used those funds to complete the PR extension of Brusa), thereby increasing the value of Telxius's fiber optic network.

87.     Telxius has knowingly accepted the benefit of CHT's efforts, know-how, and money, as well as access to the CLS in Punta Cana, under circumstances in which it is inequitable for Telxius to retain those benefits without compensating CHT therefor.

*       *       *

WHEREFORE, CHT demands damages in an amount to be proved at trial, and immediate performance of the Master Agreement by Telxius, subject to set-off in CHT's remaining obligations to the extent of the injuries caused by Telxius.

Dated: August 13, 2020                          Respectfully submitted,

*s/Clay M. Carlton*
Clay M. Carlton, FL Bar No. 85767
clay.carlton@morganlewis.com
Morgan, Lewis & Bockius LLP
200 South Biscayne Boulevard, Suite 5300
Miami, Florida  33131-2339
Telephone:     305.415.3447
Facsimile:     305.415.3001

Jason R. Scherr (*pro hac vice* forthcoming)
jr.scherr@morganlewis.com
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC  20004-2541
Telephone:     202.373.6709
Facsimile:     202.373.6460

*Counsel for CHT Holdings LLC*